DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

FRANK J. RIEBLI (CABN 221152)
ERIN A. CORNELL (CABN 227135)
Assistant United States Attorneys

     1301 Clay Street, Suite 340S
     Oakland, California 94612
     Telephone: (510) 637-3680
     FAX: (510) 637-3724
     Frank.Riebli@usdoj.gov
     Erin.Cornell@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR 19-043 YGR |
| | ) |
| Plaintiff, | ) |
| | ) GOVERNMENT'S OPPOSITION TO JOE |
| v. | ) FRANK'S MOTION FOR RELEASE |
| | ) |
| JOE FRANK, | ) |
| | ) Date: April 15, 2020 |
| Defendant. | ) Time: 10:00 a.m. |
| | ) |

## I.    INTRODUCTION

Joe FRANK asks the Court for temporary release from custody under 18 U.S.C. § 3143(i) on the ground that he has a respiratory condition and thus faces special risks should he contract COVID-19 while in jail awaiting trial.  FRANK did not report any medical issues when Pre-Trial Services interviewed him prior to his August, 2019, bail hearing.  And he does not otherwise contend that Santa Rita is unable to provide him adequate medical care if he should contract the illness.  Further, his criminal history demonstrates that he is not amenable to supervision.  He committed the crimes charged in this case while on supervised release in the Eastern District of California.  Indeed, he was intercepted during a wiretap facilitating quarter-kilo cocaine transactions from a halfway house, where he was placed following a prior supervised release violation there.  Moreover, messages extracted from his phone and iPad seized from him indicate he was also involved in pimping.  And social media messages with a co-defendant suggest that he was involved in firearms trafficking, all while on supervised release. FRANK poses a real and immediate threat to the community.  Moreover, his request for "temporary" release is, in fact, a request for release for the duration of this case, and thus not the kind of release § 3142(i) allows.  The government opposes release under any set of conditions.

## II.    FACTUAL AND PROCEDURAL HISTORY

A federal grand jury charged FRANK with participation in a conspiracy to traffic cocaine and crack cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B).  He faces a minimum of five years in prison if convicted.  FRANK was on supervised release in the Eastern District of California following a conviction for possessing a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c), at the time he committed this offense, and he has a pending Form 12 in that district.  So far as the government is aware, there is currently a warrant for his arrest in that case.  The government is informed that Probation there will oppose his release if he is arrested on that warrant.

On August 1, 2019, the Court held a detention hearing.  Pre-Trial Services recommended that the Court detain FRANK as both a flight risk and a danger to the community.  Pre-Trial noted that his extensive criminal history indicated he was not amenable to community supervision.  The Court agreed that he was a danger and ordered him detained, finding that FRANK had not rebutted the presumption of

1 | detention that arises under 18 U.S.C. § 3142(e)(3)(A).

2

3 | **III.    DISCUSSION**

4 |     **A.    Legal Standard**

5 |       The Bail Reform Act permits pretrial detention of a defendant without bail where "no condition

6 | or combination of conditions will reasonably assure the appearance of the person as required and the

7 | safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  Detention is appropriate where

8 | a defendant is either a danger to the community or a flight risk; it is not necessary to prove both.  United

9 | States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985).  The government must prove risk of non-

10 | appearance by a preponderance of the evidence, and danger to the community by clear and convincing

11 | evidence.  18 U.S.C. § 3142(f)(2)(B); Motamedi, 767 F.2d at 1406.  Categorical grants or denials of bail

12 | – untethered from an individualized determination – are impermissible.  See United States v. Diaz-

13 | Hernandez, 943 F.3d 1196, 1199 (9th Cir. 2019).  Where, as here, there is probable cause to believe that

14 | the defendant committed a drug trafficking offense with a maximum sentence greater than 10 years,

15 | there is a rebuttable presumption that "no condition or combination of conditions of release will

16 | reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C.

17 | § 3142(e).  "The presumption is not erased when a defendant proffers evidence to rebut it; rather the

18 | presumption remains in the case as an evidentiary finding militating against release, to be weighed along

19 | with other evidence relevant to factors listed in § 3142(g)."  United States v. Hir, 517 F.3d 1081, 1086

20 | (9th Cir. 2008) (internal quotations and citation omitted).

21 |       The Court considers four factors in determining whether to release or detain a defendant prior to

22 | trial:  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the

23 | defendant; (3) the history and characteristics of the defendant, including the defendant's character,

24 | physical and mental condition, family and community ties, past conduct, history relating to drug or

25 | alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as

26 | whether the crime was committed while the defendant was on probation or parole; and (4) the nature and

27 | seriousness of the danger to any person or to the community that would be posed by the defendant's

28 | release.  18 U.S.C. § 3142(g); United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986).  Considering

1    factors other than those set forth in Section 3142 is disfavored. <u>Diaz-Hernandez</u>, 943 F.3d at 1199.

2    The Court may reopen the detention hearing if the Court finds that "information exists that was

3    not known to the movant at the time of the hearing and that has a material bearing on the issue whether

4    there are conditions of release that will reasonably assure the appearance of such person as required and

5    the safety of any other person and the community." 18 U.S.C. § 3142(f). Here, FRANK offers that his

6    grandmother has now agreed to let him reside with her and that this changed circumstance mitigates the

7    risk of flight and any danger he poses to the community.

8    The Court may also "permit the temporary release" of a defendant if release is "necessary for

9    preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The

10   government bears the ultimate burden of persuasion to detain pretrial. <u>Hir</u>, 517 F.3d at 1087. However,

11   once a defendant is ordered detained, it is the defendant who must show that temporary release is

12   necessary under Section 3142(i). <u>United States v. Dupree</u>, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011).

13   FRANK contends that his medical conditions constitute a "compelling reason" for release in light of the

14   COVID-19 pandemic.

15   **B.    FRANK Is Not Amenable to Supervision and Is a Danger and a Flight Risk.**

16   The COVID-19 pandemic does not decrease the danger FRANK poses to the community if he is

17   released. He has demonstrated repeatedly that he is not amenable to supervision, and that no condition

18   or combination of conditions will keep him from committing further crimes. The danger posed to the

19   community by firearms and drug offenders is well-established. <u>See</u>, <u>e.g.</u>, <u>United States v. Zaragoza</u>,

20   2008 WL 686825, at *3 (N.D. Cal. Mar. 11, 2008) (Spero, J.) ("In assessing danger, physical violence is

21   not the only form of danger contemplated by the statute. Danger to the community can be in the form of

22   continued narcotics activity or even encompass pecuniary or economic harm.").

23   FRANK is 31 years old. According to his prior PSR and the bail report in this case, he has a

24   criminal history that stretches back more than 14 years. His first brush with the law was as a juvenile:

25   he was involved in two different burglaries; when the victim from the second burglary chased after

26   FRANK and his accomplices, they fired two or three rounds at the victim from a handgun. He received

27   83 days in juvenile hall and 6 months probation. He also has a prior felony conviction for possession of

28   cocaine base for sale, for which he received 6 months in jail and 5 years probation. He has been charged

with conspiracy to distribute that same drug in this case. In his prior case, he was originally charged with firearm possession as well, though that charge appears to have been dismissed as part of the plea deal. Nonetheless, while on probation in that case, he was arrested in the Eastern District of California for possession of a gun in furtherance of a drug trafficking crime. FRANK was one of several men who conspired to rob a drug stash house. FRANK was arrested when the group met prior to attempting the robbery. He wore a bullet-proof vest and had a short-barreled assault rifle. He was detained in that case, pleaded guilty, and was sentenced to 60 months in prison. According to the PSR in that case, as part of his acceptance of responsibility, FRANK said, "Since I've been here in jail, I've learned a very valuable lesson. Being locked up has taught me the utmost respect for the law."

Unfortunately, FRANK's desire to live a law-abiding life was short-lived. He was released to supervision on June 16, 2017. Less than six months later, Probation filed a Form 12 alleging that FRANK was using controlled substances and frequenting places where drugs are sold. Probation filed two more Form 12s in April and June, 2018, again alleging unlawful drug use. FRANK eventually admitted an allegation from the June Form 12 and the court revoked his supervision and sentenced him to 10 days in custody, followed by 28 months of supervised release. Upon his release from custody, Probation placed him in a 90-day residential drug treatment program.

It was while FRANK was in the drug treatment program that agents monitoring co-defendant George Moore's cell phone calls intercepted calls between Moore and FRANK in which FRANK arranged quarter-kilo cocaine deals. Because FRANK was in the drug treatment program – something he discussed with Moore in intercepted phone calls – he had his "girl" pick up the drugs from Moore and then return later with the payment. FRANK admitted this conduct in a recorded, pre-arrest interview. In the 30 days agents monitored Moore's communications, they intercepted calls indicating that FRANK arranged at least two such deals. He stopped arranging the deals however, when he became suspicious that his "girl" had taken some of the drug proceeds for herself. He told Moore that he was shutting everything down until he got out of the program and could manage it all directly.[1]

---

[1] Not long after FRANK got out of the drug treatment program, this same woman called 9-1-1 and reported that FRANK had pistol-whipped her and her sister and took all her money. She reported that she was bleeding from the head and had a black eye. However, when police contacted her, she refused to cooperate further, so no charges were ever filed.

Distributing cocaine wasn't FRANK's only source of income. Text messages recovered from his phone and iPad reveal that he was also a pimp who managed at least three prostitutes (at least one of whom may have been underage), also while he was on supervised release. FRANK's management of his prostitutes was manipulative and mean. He only ever referred to them as "bitch," and not by name, and made clear that the way to earn favor with him was to earn more money for him turning tricks. For example, in an exchange on June 14, 2019, FRANK told one of his prostitutes (who used a phone number ending in -1453), "I'm a pimp bitch you talking too me like I'm yo boyfriend bitch I been told you about keep yo distance bitch that's on yo hoe you here to please me no matter wat and I see you forgot that fast but it's good". On June 21, 2019, that same woman and another of his prostitutes got into a fight. FRANK was not happy. He texted her, "Bitch u focused on getting money". "I am focused on getting money" she replied, but "She's embarrassed of being a hoe". He laughed in response, "hahaha". The woman continued, "So I said in the Uber well your a prostitute that's your life if you don't like maybe you should pick a different profession". "If she's embarrassed of hoeing then she's embarrassed of you because it's the game . . ." the woman said. But FRANK wouldn't hear it. "Bitch you out of pocket perido [period]", he said, "For fighting her and fucking off ma money". "You beating up a 17 year old now you hard bitch get some money", he said.

Moreover, it appears FRANK managed his prostitutes – including payment for their services – remotely, something he could do from his grandmother's house or a halfway house, just as he managed drug distribution from inside a drug treatment program. For example, on May 26, 2019, at about 11:03 p.m., FRANK texted one of workers (who used a phone ending in -6005) "Bitch u got my trap for last one []???" "Yes," she replied, "in my jacket". About an hour later, she sent him an address in Richmond. A half hour later, they had this exchange:

| -6005 | [Ok emoji] tell me when you get the 3$ |
|-------|----------------------------------------|
| FRANK | Ok |
| FRANK | Not yet |
| FRANK | Look at him send it |
| -6005 | Got it |
| -6005 | ? |
| FRANK | Not yet |
| -6005 | Check the bank account |
| FRANK | Not there yet |
| * * * | |
| -6005 | It says on his phone that he sent |
| FRANK | So you see his last transaction of 20.00 there too |
| -6005 | Yes |

```
                    * * *
           -6005        Did you get it
           FRANK        No he got iPhone he can send Apple Pay
```

About six hours later, FRANK got two incoming text messages from Chase QuickPay, both from the

same person. The first was for $20, the second was for $300. A few days later, FRANK sent this same

woman a link to an escort site. Later that same night (or rather, early the next morning), the woman sent

FRANK a Castro Valley address, then, "I think he is paying thru zelle". Zelle is another payment app.

FRANK responded with his email address: "Darealbobebobe@gmail.com". "Get more [money bag]

[money bag]" he told her. A short time later, she responded, "Tell me if you receive", "It sent".

FRANK notified her, "It was a direct hit get more money". The next night, FRANK messaged her,

"You been wit him 30 mins blood", meaning, 'Are you done yet? Where's my money?' She responded,

"Going to atm", presumably to deposit the cash the man had paid her. On another night (June 6, 2019),

she asked FRANK to send the "trick" a screenshot of her estimated time of arrival and then said, "Ima

have him send the payment to Taylor's phone". Based on the messages extracted from FRANK's

phone, "Taylor" appears to be another of his sex workers.

These kinds of messages continued with FRANK's sex workers through July 25, 2019, when

agents arrested him. For example, at about 9:25 p.m. on July 24, 2019, one of FRANK's workers (using

a phone number ending in -7496) texted him "My regular might want to see me". FRANK responded,

"Ok he going come get u". "He will provide Lyft if he confirms" she said. About a half hour later, she

reported, "My regular wants me later". About 11 p.m., FRANK messaged her, "Get ma money up".

"Yes daddy" she responded. Just before midnight, she messaged "I have outcall to my regular 300 hr".

She then wrote, "Never mind he only has cash all" "App*". FRANK responded, "Lol". At about 4:00

a.m. that same night/morning, FRANK texted her, "Get Taylor phone so when she drives u can talk to

tricks and stuff". Agents arrested FRANK later that day.

FRANK also appears to have acquired guns while on supervised release and this further shows

he is dangerous and not amenable to supervision. United States v. Daychild, 357 F.3d 1081, 1100 (9th

Cir. 2004) (approving detention on danger prong due to defendant's possession of firearms and stating

that "danger posed to the public by armed conspirators who traffic in illicit drugs is too plain to permit

dispute."). FRANK's co-defendant, Deshawn Lemons-Woodard, exchanged Instagram messages with

"infamous_bobe" related to gun sales. "Bobe" (pronounced 'Bo-bee') is FRANK's nickname.[2] On October 9, 2018, an informant asked Lemons-Woodard if Lemons-Woodard "got anything u tryna let go ?" Lemons-Woodard said he had some "Hand things," which was the code they used for pistols. When Lemons-Woodard asked how much the informant was willing to spend, the informant said "It don't matter . whatcha got ?" About six minutes later, Lemons-Woodard sent an Instagram message to "infamous_bobe" asking "U got anything left I got a move up sumbody want one for the hi" meaning that he had a customer who was willing to pay a high price for a gun. On December 12, 2018, Oakland police conducted an enforcement action on Makin Road in Oakland and seized crack cocaine and guns. The next day, Lemons-Woodard messaged "infamous_bobe" asking "U got sum for sale"? "[phone number] text me Leme kno what u got rn [right now] I'll grab whatver u got I need sum i jus got all my shit took". "infamous_bobe" responded, "All I really got is that glock 19 and a sig p226". It is unclear whether either transaction between FRANK and Lemons-Woodard took place, but it is clear that Lemons-Woodard viewed FRANK as a source for guns. Indeed, when FRANK's "girl" called 9-1-1 to report that he had pistol-whipped her, she warned police that he had guns. A May 27, 2019 text message from FRANK's phone supports this. FRANK warned someone: "You disrespectful ass lil Nigga if you had money on you I will strip you wit ma glock but since you ain't got nun u lucky I slap yo ass when I see u nigga you a kid stay in a kids place I'm a real thug understand I do wat I want".

FRANK argues that he is not a flight risk because he did not flee after agents interviewed him on January 30, 2019. But neither did it deter him from continuing to commit crimes – all of the messages related to pimping are from the months after that interview. Indeed, if he was able to carry on a robust drug business while living in a residential treatment program, there is no reason to believe that living with his grandmother will dissuade or prevent him from continuing to traffic drugs or pimp women and girls. Moreover, the Form 12 currently pending in the Eastern District alleges (based on geo-tagged photos of himself that he posted on "infamous_bobe") that FRANK left the district without permission numerous times in December 2018, and March and May 2019 (again, after the January interview).

---

[2] FRANK's "girl" identified herself to George Moore in an intercepted call as "Bobe's girl," when FRANK was arrested, he had a gold and jewel-encrusted necklace with the words "2x BOBE," and his text messages indicate he used a gmail address with that same nickname. Moreover, FRANK's Probation Officer in the Eastern District looked at the "infamous_bobe" Instagram account and found photos of FRANK.

FRANK may contend that this time is different, that he will conform this time. But he's said that before.

Finally, the government contacted FRANK's probation officer to ask if she would support or oppose his release in the Eastern District if he were to appear on the Form 12 there. She said she would be "firmly opposed" to his release. This at least raises the possibility that FRANK would not actually get out of custody, but would instead be held in custody in another district. That would make it impossible for him to make his court appearances here.

The government therefore recommends that the Court order that FRANK remain in custody, just as numerous magistrate judges have denied similar motions for pretrial release, including those brought by defendants with underlying medical conditions. See, e.g., United States v. Reynolds, 18-CR-158 JD (SK), Dkt. 108 (N.D. Cal.) (detaining defendant pending trial identified as medically vulnerable to COVID-19 by Santa Rita on the basis of danger); United States v. Batiste, 16-CR-278 CRB (JCS), Dkt. 63 (N.D. Cal) (denying motion for release based on COVID-19 of defendant with heart and lung damage on the basis of danger, insufficient information regarding medical condition and inadequate release plan); United States v. McHale, 19-CR-526 WHO (JCS), Dkt. 48 (N.D. Cal.) (denying motion for release based on COVID-19 of diabetic defendant who had bond revoked and had poor pre-trial release record); United States v. Mazariegos, 20-CR-003 EMC (SK), Dkt. 28 (N.D. Cal.) (denying motion for release based on COVID-19 of defendant on basis of risk of flight); United States v. Sanchez, No 19-CR-576 VC (JSC), Dkt. 23 (N.D. Cal.) (denying motion for release of defendant on the basis of danger and rejecting proposal that he live with mother because he had previously been living with them while committing his offenses); United States v. Traore, No. 20-CR-029-VC (JSC), Dkt. 28 (N.D. Cal.); United States v. Campos, No. 19-CR-0280-RS (JSC), Dkt. 95 (N.D. Cal.); but see In the Matter of the Extradition of Alejandro Toledo Manrique, No. 19-mj-71055-MAG-1 (TSH), Dkt. 115 (N.D. Cal.) (granting motion for release premised on COVID-19 concern in extradition proceeding, with different standards for release than under the Bail Reform Act, where defendant was more than 70 years old); United States v. Garcha, No. 19-cr-00663-EJD-1 (VKD), Dkt. 26 (Apr. 1, 2020) (denying relief under § 3142(f) but granting temporary release under 18 U.S.C. § 3142(i) where the defendant's "individual circumstances—a compromised immune system [due to HIV] and lung damage due to a pulmonary embolism—render him particularly susceptible to infection from the COVID-19 virus while in custody

1  and particularly at risk of severe illness or death as a result of such infection").

2  **C.     FRANK Is Not Entitled to Release Under 18 U.S.C. § 3142(i).**

3  FRANK is ineligible for release under 18 U.S.C. § 3142(i) for two reasons.  First, FRANK does

4  not specify an end-date to the release he seeks – it appears he wants release for the duration of the case.

5  Section 3142(i) only authorizes temporary release.  He does not qualify for release under this provision.

6  Second, FRANK's health concerns are not a compelling reason for release.  "[I]t is a rare case in

7  which health conditions present an 'exceptional reason'" to allow for release where detention would

8  otherwise be warranted.  See, e.g., United States v. Wages, 271 F. App'x 726, 728 (10th Cir. 2008)

9  (collecting cases).  Cf. United States v. Kidder, 869 F.2d 1328, 1330–31 (9th Cir. 1989) (to prevail on

10 Eighth Amendment claim regarding avoiding prison due to medical condition, defendant "must show

11 that no constitutionally acceptable treatment can be provided while he is imprisoned").

12 FRANK argues that he has had bronchitis in the past, and occasionally has shortness of breath

13 (due to a gunshot wound he received 12 years ago), and that this puts him at risk of serious illness if he

14 contracts COVID-19.  This, he says, is a "compelling reason" for his release under § 3142(i).  The CDC

15 states that persons with "chronic lung disease" have a higher risk of severe illness if they contract the

16 illness.  See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-

17 risk.html (last visited Apr. 10, 2020).  The record on FRANK's physical condition is unclear.  The PSR

18 from his recent case in the Eastern District states that FRANK was diagnosed in 2013 with asthma/

19 chronic obstructive pulmonary disorder.  Yet in his motion, he does not contend that he has a chronic

20 condition, only that he has had it in the past.  The same is true of his claim that he occasionally has

21 shortness of breath – he does not claim this is a chronic condition, only that he has had it on occasion.

22 And FRANK did not report these conditions to Pre-Trial Services in late-July 2019, when Pre-Trial

23 asked him about his health as part of its preparation of the bail study.  To the contrary, he apparently

24 reported that he has "no physical or mental health issues."  Indeed, FRANK did not seek emergency

25 release earlier this year when there was an outbreak of the flu in the jail, even though the flu also poses a

26 greater risk to people with respiratory issues.  See https://www.cdc.gov/flu/highrisk/ asthma.htm

27 ("People with asthma are at high risk of developing serious flu complications, even if their asthma is

28 mild or their symptoms are well-controlled by medication.") (last visited Mar. 25, 2020).  And in that

case, the flu was not as widespread outside the jail as COVID-19 is now.  As of April 14, 2020, San Joaquin County reports 314 cases and 17 deaths.  See https://www.sjgov.org/covid19/.  Most of those cases are in Stockton, where FRANK's grandmother lives.  See http://www.sjready.org/events/covid19.html (last updated Apr. 10, 2020).

Moreover, FRANK does not claim that the jail has failed to provide him necessary treatment for a medical condition.  Nor does he claim that he has contracted COVID-19, or that the jail would be unable to provide him adequate medical care if he did.  To the contrary, Santa Rita's COVID-19 information page reports that, of the 15 people who have or have had COVID-19 in custody, six have completely recovered.  See https://www.alamedacountysheriff.org/admin_covid19.php (last updated Apr. 13, 2020).  If FRANK were to contract COVID-19 while in custody, he would receive medical care there.  If his case became more serious than the jail could handle, the jail would transport him to an outside hospital to receive appropriate medical care.  Further, as the Court is aware, the jail has taken numerous steps to quarantine those who are or may be infected, and limit the spread of the virus: it has distributed masks to inmates and staff; decreased the jail population by almost 26%; increased cleaning; and, made hand wipes and soap available to all units.

For all of these reasons, FRANK fails to demonstrate that his medical condition is a "compelling reason" warranting release under § 3142(i).

## IV.     CONCLUSION

For the foregoing reasons, the government asks that the Court deny FRANK's motion.

DATED:  April 14, 2020                                      Respectfully submitted,

                                                           DAVID L. ANDERSON
                                                           United States Attorney

                                                           ___/s/_____
                                                           FRANK J. RIEBLI
                                                           ERIN A. CORNELL
                                                           Assistant United States Attorneys